IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MURRAY AMERICAN RIVER TOWING, INC.; MURRAY AMERICAN TRANSPORTATION, INC.; NAVIGATORS INSURANCE COMPANY; AGCS MARINE INSURANCE COMPANY; AND STARR INDEMNITY & LIABILITY COMPANY, <br><br> Plaintiffs, <br> v. <br><br> UNION RAILROAD COMPANY, <br><br> Defendant. | Case No. 2:15-cv-01374 |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Conti, Chief United States District Judge

I.  Introduction

This case arises from an incident on March 4, 2015, in which several barges broke away from a coal dock and were damaged when they hit a bridge. The barges were owned by plaintiffs, sister corporations Murray American River Towing, Inc. ("MARTI") and Murray American Transportation, Inc. ("MATI") (collectively, "Murray"). At the time of the breakaway, the barges were fleeted at a river-to-rail transfer facility on the Monongahela River owned and operated by defendant Union Railroad Company ("Union").

Union does not contest liability. The parties stipulated that Union is liable to Murray for damages to nine barges involved in the breakaway and inspection and survey costs in the amount

of $30,791.37. *See* Stipulation, ECF No. 60. The sole remaining dispute is the amount of damages to which Murray is entitled for Barge MRT-1923 ("Barge 1923"), which sank in the breakaway and was sold for scrap.

II. Findings of Fact

    A. Barge 1923

1. Barge 1923 was a standard-sized barge, 26 feet wide by 175 feet long. It was used to transport coal to electric generating power plants on the Monongahela, Allegheny and upper Ohio rivers. Tr. 9.

2. Barge 1923 was built in 1985. At the time of the breakaway, Barge 1923 was 30 years old. Barge 1923 was built as part of the "1900 series" of barges. Tr. 56-57.

3. The estimated useful life of a new standard barge is 25 years. Tr. 21. The actual useful life of a particular barge depends on the intensity of its usage and its useful life can be extended by performing a "rebuild." Tr. 29.

4. In June 2010, Barge 1923 was rebuilt by Murray's predecessor, Consol Energy. Its sides, rakes and knuckles were overlaid with new steel plating at a cost of $148,200. Tr. 27.

5. After the rebuild, it was anticipated that Barge 1923 would have a useful life of 15 years. Tr. 28.

6. Following the rebuild in 2010, Barge 1923 remained in continuous active service and was loaded every 10-14 days with coal to service power plant customers. Murray's president, Michael Somales ("Somales"), characterized this service as light duty. Tr. 29. Somales has 41 years of experience in the river industry, including prior jobs as a deckhand, pilot, captain and general manager. Tr. 7. He started his career with Consol Energy and was

named president of MARTI and MATI when Murray acquired Consol Energy's river operations. Tr. 7-8.

7. There is no evidence that Barge 1923 suffered any damages or received any maintenance or repairs after it was rebuilt in 2010. Tr. 30; Pl. Ex. 6.

8. In December 2013, Murray purchased Consol Energy's entire river operations, including Barge 1923. Tr. 8; D's Ex. H at 10.

9. On March 4, 2015, Barge 1923 was part of the breakaway, allided with a bridge pier, broke in half and sank. It was damaged beyond repair. Tr. 12.

10. During the salvage of Barge 1923 in 2015, Union's expert witness Alvan D. "Bud" Osbourne inspected the barge and personally observed that it had a collapsing inner bottom, as evidenced by the heavy accumulation of coal in the inner bottom. He opined that despite the rebuild, Barge 1923 was nearing the end of its useful service life. D's Ex. K and photographs attached thereto.

11. On May 15, 2015, Barge 1923 was raised from the river, cut up and sold as scrap by River Salvage. Tr. 14-15.

12. Murray received $10,000 from River Salvage for the scrap value of Barge 1923, which it placed in escrow. Tr. 15.

13. Murray received another offer of $18,000 for the scrap value of Barge 1923 from Monongahela Iron and Metal, the company to whom he sells his barges for scrap. Somales accepted the lower offer from River Salvage to avoid an $8,000 fee for transportation of the barge, so it was a wash. Tr. 15. Somales explained that River Salvage had a great deal of leverage over him in this negotiation because River Salvage had physical possession of Barge 1923. Tr. 15.

B. Market Conditions

14. Barges are built in three different sizes. Standard barges, such as Barge 1923, are 26 feet wide by 175 feet long. Stumbo barges are 26 feet wide by 195 feet long. Jumbo barges are 35 feet wide by 195 feet long. Tr. 9.

15. Following its acquisition of Consol Energy's fleet of vessels in December 2013, Murray was the only company in the United States that owned and operated standard barges to haul coal. Tr. 35-37; Pl. Ex. 11.

16. In most of the country, jumbo barges are used to transport coal. The smaller standard barges are not economical. Tr. 23. No new standard barges have been built since 2002. Pl. Ex. 11 at M000356.

17. In the Pittsburgh, Pennsylvania region, however, two large power plants, Fort Martin and Cheswick, have continuous bucket unloading systems ("CBUs") that require "skinny" barges that are 26 feet wide. Tr. 23-24.

18. Murray has exclusive, long-term, above-market supply contracts with both the Fort Martin and Cheswick facilities and attempted to maintain a dominant position for this business. Tr. 23, 35, 38. These exclusive supply contracts were in place long before the breakaway incident in March 2015, and are due for renewal in 2019. Murray expects that the contracts will be renewed because it is the only company with a fleet of standard barges. As Somales explained: "There's nowhere else to go. We're it." Tr. 38.

19. As of March 2015, Murray owned a fleet of 289 standard barges and 124 stumbo barges. The only potential competitor for the Fort Martin and Cheswick supply contracts is Campbell's Transportation, which owns and operates a fleet of 127 stumbo barges. Pl. Ex. 11.

20. In transportation, a fleet is always in flux. The operator adds and subtracts barges depending on where a utility decides to buy its coal. When less barges are needed, the operator pulls the oldest, most labor-intensive barges out of service. Tr. 44.

21. In October 2013, the Hatfield's Ferry power plant closed, which caused barges to be taken out of service because they were no longer needed to transport coal to that power plant. Tr. 64.

22. Because Murray has long-term, above-market supply contracts at the Fort Martin and Cheswick power plants, fluctuations in the national coal market have limited impact on the value of the barges used to service those contracts. Tr. 39.

   C. Sales of Similar Barges

23. Murray sometimes sold old barges to other companies for noncompetitive uses like spar barges and dredging and spoil operations. Somales explained that he priced these barges by taking their scrap value and adding a $10,000 market premium. Tr. 19-20.

24. On September 30, 2010, Mon River Towing, one of Murray's predecessors, purchased 19 standard barges from Indiana Michigan Power Co. for $156,000 per barge. The barges were twenty to twenty-one years old and were not rebuilt. Tr. 32-33. These barges were lightly used, were the last standard barges available in the country, and Campbell Transportation also wanted to purchase them. Tr. 33.

25. On November 28, 2011, Mon River Towing purchased 37 standard barges from JP Morgan for $160,000 per barge. These barges were more than twenty years old and had not been rebuilt. Tr. 34; Pl. Ex. 11.

26. In February 2014, the entire fleet of Consol Energy's towboats and barges was valued in the aggregate in connection with Murray's purchase of Consol Energy's river operations.

The 18 "Series 1900" barges were deemed to have two years of remaining useful life and were assigned an aggregate value of $925,200, or $51,400 per barge. Tr. 73-74; D's Ex. F.

27. This valuation is entitled to little weight in determining the fair market value of Barge 1923 because the accountants were not concerned about the accuracy of the estimate, the barges represented a small piece of a $3 billion acquisition, the barges were not inspected prior to the valuation, and they were not given individual values. Tr. 85-86.

28. In the thirteen months following the breakaway, from March 2015 through April 2016, Murray sold 70 standard barges to six different purchasers in arm's length transactions to be used for dredge spoil, spar barges or scrap.

29. The contracts included a provision that the barges could not be used in competition with Murray for commercial movement of coal, sand or stone. Tr. 46-47; D's Ex. G.

30. The post-breakaway sales of standard barges by Murray are tabulated in defendant's exhibit C:

    i. In May 2015, Murray swapped a barge to River Salvage without a dollar figure.

    ii. In August 2015, Murray sold two barges to McGrews at $20,975 per barge and two barges to Mon City Iron & Metal ("Mon City") at $25,500 per barge. The two barges sold to McGrews were sold to replace barges damaged by Murray in an accident. Tr. 42.

    iii. In January 2016, Murray sold 42 barges to four different buyers. Twenty-three of the barges were sold at $15,000 and nineteen barges were sold at $12,000.

iv. In April 2016, Murray sold 21 barges to two different buyers at $12,000 per barge.

D's Ex. C.

31. Despite these sales, Murray still had a large enough fleet of barges to fulfill its contracts. None of the 70 barges sold in 2015-2016 were replaced. Tr. 65.

32. Somales testified at the hearing that he was ordered to sell these barges by Murray's owner and chief executive officer. The company needed to raise money because it had just acquired another coal company in the Illinois basin. Tr. 44-45.

33. Somales characterized these sales as "fire sales," but he did not testify about when the acquisition occurred, when he received the directive to sell or the length of the "fire sale." In its proposed findings of fact, Murray states that barges "sold in 2016" were part of this "fire sale." ECF No. 65 ¶ 27. In 2016, the quantity of barges sold increased dramatically and the price dropped by over $8,000 from those sold in 2015. D's Ex. C.

34. Somales testified that he sold the barges that were the oldest and in poorest condition in Murray's fleet. Tr. 48.

35. The sales included five other barges manufactured in the same "1900 series" as Barge 1923. Tr. 57-58. Barge 1904 sold in January 2016 for $12,000, and Barges 1902, 1907, 1913 and 1921 each sold in January 2016 for $15,000. D's Ex. C.

36. Five of the barges sold had previously been rebuilt. Tr. 61. The sale price of these rebuilt barges did not materially differ from the sale price of non-rebuilt barges. PCC 517 sold in January 2016 for $15,000; PCC 580 sold in April 2016 for $12,000; PCC 561 sold in January 2016 for $12,000; PCC 536 sold in January 2016 for $15,000; and MRT 1034 sold in January 2016 for $15,000. Tr. 59-61; D's Ex. C.

37. With the exception of barges sold for scrap, all the barges sold by Murray in 2015 and 2016 are still in service on the river. Tr. 48.

38. The 70 standard barges sold by Murray in 2015 and 2016 were in roughly the same condition as Barge 1923 at the time of the breakaway.[1]

III.   Conclusions of Law

   A. Controlling Law

1. The historic rule for calculation of damages in admiralty cases requires restoring the vessel owner to the same position it would have been in before the damage occurred—"restitutio in integrum." In the event of a total loss, the measure of damages is the market value of the vessel immediately prior to the time of its destruction. *The Baltimore*, 75 U.S. 377, 385-86 (1869).

2. In *Matter of Bankers Trust*, 658 F.2d 103, 106 (3d Cir. 1981), the court explained:

   [D]amages for the loss of [a vessel] must be measured by the fair market value of the ship at the time of its destruction. Fair market value "is established by contemporaneous sales of like property," *Standard Oil of New Jersey v. Southern Pacific Co.*, 268 U.S. 146, 155, 45 S. Ct. 465, 467, 69 L. Ed. 890 (1925), but in the absence of such a market, a court should consider other factors to determine "the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy," *id*. at 155-56, 45 S. Ct. at 467.

3. If relevant sales data does not exist, a court may consider the cost to reproduce the vessel as evidence of value. *Standard Oil*, 268 U.S. at 156; *Barton*, 316 F.2d at 552. The Supreme

---

[1] Union's proposed finding of fact ¶ 39 posits that Jimmy Zubik, the owner of River Salvage, told Osbourne that some of the barges Zubik purchased from Murray in 2015 and 2016 were actually in better condition than Barge 1923. D's Ex. M at 55. The court will not credit this proposed fact because it is based on inadmissible hearsay. Fed. R. Evid. 801(c).

Court cautioned, though, "that value is the thing to be found and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide." *Id*.

4. In *Barton v. Borit*, 316 F.2d 550, 552 (3d Cir. 1963), the court held that if there is sufficient sales data, a court cannot base fair market value on an alternative methodology: "[W]hen there is evidence of a number of sales on an open market of similar vessels the prices paid would set the limits of valuation to which the court must adhere, and resort to other indicia of value is not warranted." *Id*. at 553. A court may only use alternative methods, such as replacement cost appropriately depreciated, if there was no market for similar boats or "there were so few sales of like boats that it could not be predicted with any assurance that the prices paid would be repeated in a postulated sale of the boat in question." *Id*.; *accord Cody v. Phil's Towing Co.*, 247 F. Supp. 2d 688, 694 (W.D. Pa. 2002) ("The current record suggests that in all likelihood the M/V Bonnie J. Johnson had a market value on the date in question. In light of this fact the court's sole endeavor is to determine what that value was, not to devise some other measure of value for the vessel.").

5. A search for relevant sales should not be geographically limited, although sales in distant markets must include an allowance for transportation and refitting costs. *Id*. In *Barton,* the court framed the test as "whether sales on the catamaran market at about the time of the loss were numerous enough to afford reliable evidence of the value of such vessels." *Id*.

6. The district court must make a specific finding about whether the sales data affords reliable evidence of value. *Id*.

7. In *Bankers Trust Co.*, the court affirmed that a contemporaneous sales market (albeit a poor one) existed even though there was only one, non-arm's length sale of a dissimilar ship. 658 F.2d at 107.

8. In *In Matter of Complaint of Tug Beverly, Inc.*, No. CIV. A. 92-0099, 1994 WL 194891, at *1 (E.D. Pa. May 13, 1994), the court considered sales data from approximately one year before the loss to fourteen months after the loss.

    B. Existence of a market in this case

9. There is relevant data for sales of 70 similar standard barges within thirteen months of the breakaway incident.

10. Under these circumstances, a contemporaneous sales market existed which provides reliable evidence of the fair market value of Barge 1923 prior to the breakaway incident. Selling barges over a several month period to multiple buyers is not consistent with a fire sale.[2]

11. Standard barges are fungible and there is no evidence in the record that Barge 1923 possessed any unique characteristics. Five of the barges sold by Murray in 2015-2016 were part of the same 1900 series as Barge 1923. Tr. 57-58. At least five of the barges sold in 2015-2016 had been rebuilt. Tr. 61. The price paid for these barges did not materially differ from the prices paid for other barges. D's Ex. C.

12. Murray was a willing seller. Tr. 54. Its fleet had a surplus of at least 70 standard barges, as evidenced by the non-replacement of the barges sold in 2015-2016.

---

[2] The term "fire sale" connotes a sale at reduced prices, especially one brought about by an emergency. Black's Law Dictionary 634 (6th ed. 1990).

13. There were six different buyers of the standard barges in 2015-2016. Somales testified that the buyers were experienced entities in the river industry with whom he had long-term relationships. Tr. 53-54.

14. The prices paid by the different buyers were similar, but not identical. The court concludes that the prices paid in 2015-2016 reflected arm's length negotiations between buyers and sellers of similar bargaining power.

15. Murray's proposed valuation methodology, which is based on its book value, will not be used because a market existed for standard barges at the relevant timeframe. Because sufficient sales data exists, the court cannot base its fair market value determination on an alternative methodology. *Barton*, 316 F.2d at 553.

16. Although a market existed, that market was skewed by Murray's dominant position in the industry as the only owner of standard barges and the exclusive provider of standard barge coal deliveries to the Fort Martin and Cheswick power plants.

17. The court will make adjustments to the 2015-2016 sales data as necessary to determine the fair market value of Barge 1923 at the time of the breakaway incident in March 2015. *See, e.g., Bankers Trust*, 658 F.2d at 108 (court started with sales price and made adjustments to reflect differences in age, speed and tonnage between the destroyed vessel and the sold vessel to find fair market value).

    C.  Definition of Fair Market Value

15. The determination of a fair market value requires an assessment of the value of the asset in an open market – what a willing buyer would pay to a willing seller. *See Cody v. Phil's Towing Co.*, 247 F. Supp. 2d at 694 (quoting *Standard Oil*, 268 U.S. at 155-56) (fair market

value is "the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy.").

16. The fair market value of an asset must be based on the conversion of that asset into cash in a reasonable period of time, rather than in a distress sale. *In re Trans World Airlines, Inc.*, 134 F.3d 188, 193-94 (3d Cir. 1998).

17. Fair market value cannot be based on an asset's idiosyncratic value to one entity. *See Rohm & Haas Co. v. Am. Fin. Grp., Inc.*, No. CIV.A. 88-5658, 1988 WL 115786, at *2 (E.D. Pa. Oct. 31, 1988), supplemented, No. CIV.A. 88-5658, 1989 WL 18841 (E.D. Pa. Mar. 6, 1989) ("It would plainly be a perversion of the contractual language to construe "fair market value" as "value in place", or as embodying any concept recognizing values unique to a particular purchaser."); *United States v. 564.54 Acres of Land, More or Less, Situated in Monroe & Pike Ctys., Pa.*, 441 U.S. 506, 514, 518–19 (1979) (values arising from an owner's unique need for the property are not compensable); *Estate of Richmond v. C.I.R.*, 107 T.C.M. (CCH) 1135 (T.C. 2014), 2014 WL 538640, at *13 ("what we seek is a fair market value—the price at which PHC would change hands between a willing buyer and a willing seller, *not* the price that a particular seller might demand or that a particular buyer might be willing to pay") (emphasis in original).

18. The fair market value of Barge 1923 must be based on the price at which Murray would sell and a willing buyer would pay for it.

   D.  Value of Barge 1923

19. Standard barges are not economically viable for hauling coal in any other part of the country.

20. Because the CBUs at Fort Martin and Cheswick require "skinny" barges, Barge 1923 had an idiosyncratic, higher value to Murray than to any other potential user in the open market.

21. Because Murray had exclusive long-term supply contracts with Fort Martin and Cheswick, it is unlikely that any buyer of Barge 1923 in March 2015 would have used it for anything other than dredge and spoil operations or as a spar barge, even in the absence of a noncompete provision.

22. There is conflicting evidence regarding scrap value: (a) Murray actually received $10,000 from River Salvage for the scrap value of Barge 1923 in March 2015; (b) Murray received a higher offer of $18,000 for Barge 1923 from Monogahela Iron and Metal in March 2015; (c) Murray was forced to accept the lowball offer from River Salvage due to the leverage River Salvage had at that time, Tr. 15; and (d) Murray sold four barges in August 2015 for roughly $21,000 to $25,500 each, which suggests a scrap value of $11,000 to $15,500 if Somales received his typical $10,000 market premium on these sales. There is no evidence in the record regarding how the scrap value changed between March and August 2015.

23. After weighing this evidence, the court concludes that the scrap value of Barge 1923 immediately prior to its destruction on March 4, 2015, was $18,000. Murray received a contemporaneous offer from Monogahela Iron and Metal for $18,000. Tr. 15. If not for the accident, Murray could have accepted that offer.

24. The court concludes that prior to barge sales in 2016, Murray demanded and received a market premium of $10,000 above scrap value to sell a standard barge to another company for noncompetitive uses. The prices of standard barges sold in 2016 reflect that either Murray was no longer able to negotiate this $10,000 premium or the scrap value declined.

25. Murray regularly sold old barges for their scrap value plus a $10,000 market premium. Tr. 18-20.

26. Sales of 70 standard barges occurred over 13 months in 2015-2016, which reflected the existence of a willing seller and six willing buyers over an extended timeframe shortly after the breakaway incident. The sales closest in time, in August 2015, reflected prices of $20,975 and $25,500. D's Ex. C.

27. It was important to Murray to prevent standard barges from being used to haul coal by competitors. Because Murray maintained exclusive supply contracts with the Fort Martin and Cheswick power plants through 2019 and an entire fleet of "skinny" barges would be required to compete effectively with Murray, the noncompete provisions in the 2015 and 2016 sales did not materially affect the sales price of those transactions.

28. No buyers in the market would have been willing to pay significantly more than a $10,000 premium above scrap value for a standard barge.

29. Based upon the record, the fair market value of Barge 1923 on March 4, 2015, immediately prior to the breakaway, was $28,000.

    E. Prejudgment Interest

30. The rule in admiralty is that prejudgment interest should be awarded unless there are exceptional circumstances that would make such an award inequitable. *Bankers Trust*, 658 F.2d at 108.

31. "Exceptional circumstances" exist only if the party requesting interest has (1) unreasonably delayed in prosecuting its claim, (2) made a bad faith estimate of its damages that precluded settlement, or (3) not sustained any actual damages. *Id*.

32. If the court concludes that such circumstances are present, it has discretion to deny prejudgment interest. The denial of prejudgment interest must be limited to exceptional circumstances because prejudgment interest in admiralty is compensatory, not punitive. *Id*.

33. Murray's estimate of Barge 1923's fair market value based on book value was somewhat excessive but was not in bad faith and does not constitute an exceptional circumstance.

34. Prejudgment interest will be awarded in this case at a rate of 6% per annum. *See Delaware River Tow, LLC v. Nelson*, 382 F. Supp.2d 710, 713 (E.D. Pa. 2005) (applying Pennsylvania's legal rate in an admiralty case).

IV. Conclusion

The parties stipulated that Union owes Murray damages of $30,791.37 relating to the other barges involved in the breakaway incident. Prejudgment interest will be awarded on this amount at a rate of 6% per annum, beginning April 1, 2015, the date the repairs were made, through the date of this order. ECF No. 65 ¶ 169.

Murray received $10,000 salvage for Barge 1923, which must be offset against its damages. Union, therefore, owes Murray $18,000 to reflect the fair market value of Barge 1923 immediately prior to the breakaway incident, less its salvage value. Prejudgment interest will be awarded on this amount at a rate of 6% per annum, beginning March 4, 2015, the date Barge 1923 was destroyed, through the date of this order. ECF No. 65 ¶ 168.

Judgment will be entered in favor of Murray and against Union in the total amount of $48,791.37 plus prejudgment interest as set forth above.

Dated: January 22, 2018

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge